**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

United States Court of Appeals
Fifth Circuit

**F I L E D**

September 28, 2009

Charles R. Fulbruge III
Clerk

No. 08-20701

RTM MEDIA, L.L.C.,

Plaintiff-Appellant,

versus

CITY OF HOUSTON,

Defendant-Appellee.

Appeal from the United States District Court
for the Southern District of Texas

Before HIGGINBOTHAM, SMITH, and SOUTHWICK, Circuit Judges.

JERRY E. SMITH, Circuit Judge:

RTM Media appeals a summary judgment for the City of Houston. We affirm.

## I.

Houston's sign code threatens to eliminate most of the fifty-nine billboards

owned by RTM, an outdoor advertising company. The city sued in state court, accusing RTM of violating the sign code and being a public nuisance; RTM then sued in federal court, alleging that the code violates the First Amendment and that it cannot be enforced against billboards that have been separately licensed by the state.

RTM says that the First Amendment prohibits the sign code's disparate treatment of commercial and noncommercial speech. The code classifies signs as "on-premise" or "off-premise," depending on whether they provide information related to the premises on which they are located;[1] the code requires the abatement of off-premise signs. It excludes from regulation all noncommercial signs, defined as

> a structure that is used exclusively and at all times (except when there is no copy at all on the structure) for messages that do not constitute advertising, including, but not limited to, political messages, religious or church related messages, public service, governmental and ideological messages and other copy of a nature that is not commercial advertising . . . .

SIGN CODE § 4619(c).[2]

RTM also contends that Houston does not have the authority to regulate RTM's signs. The signs in question are located in the city's extraterritorial jurisdiction ("ETJ"), and the state Department of Transportation has issued state

---

[1] To be precise, according to the code, an on-premise sign is "any sign identifying or advertising the business, person, activity, goods, products or services primarily sold or offered for sale on the premises where the sign is installed and maintained when such premises is used for business purposes." SIGN CODE § 4603(a). An off-premise sign is "any sign that advertises a business, person, activity, goods, products or services not usually located on the premises where the sign is installed and maintained, or that directs persons to any location not on the premises." *Id.*

[2] Thus, the familiar gas-station sign listing prices for various grades of gas qualifies as a permitted "on-premise" commercial sign, but a roadside billboard advertising "Shell Gas Station, Exit 5 Miles Ahead" is a prohibited "off-premise" commercial sign. Signs with noncommercial messages, such as "Attend Epiphany Catholic Church" or "All change is bad!", are not regulated by the code.

permits for them. RTM argues that the city does not have the right separately to regulate the ETJ and that any attempt to supersede the state permits is a due process violation.

At the outset of the federal litigation, the district court granted RTM's request for a preliminary injunction to prevent Houston from enforcing the code. The court determined that the code is probably unconstitutional and that RTM is therefore likely to succeed on the merits. A year later, however, the court reversed course and granted summary judgment for the city, explaining that commercial signs are far more numerous than are noncommercial ones, a fact that provides an adequate rationale for treating them differently given the objective of reducing visual clutter and distraction along public roadways.

Having affirmed the constitutionality of the code, the court abstained on the ETJ issue so that it could be resolved in the pending state court proceedings. RTM appeals, reasserting that the code violates the First Amendment and contending that the district court should not have abstained.

## II.

"We review grants of summary judgment *de novo,* applying the same legal standard used by the district court. Summary judgment is proper when the evidence demonstrates that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Chacko v. Sabre, Inc.*, 473 F.3d 604, 609 (5th Cir. 2006) (internal citations and quotation marks omitted).

## III.

As recognized by the district court and the parties, the First Amendment issue is governed by *Metromedia, Inc. v. City of San Diego*, 453 U.S. 490 (1981), and *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410 (1993). We

therefore apply those decisions to the case at hand.

A.

In *Metromedia*, the Court addressed the constitutionality of a San Diego ordinance that permitted on-site commercial advertising, banned off-site commercial advertising, and allowed only certain content-specific categories of non-commercial advertising (e.g., "[t]emporary political campaign signs . . . maintained for no longer than 90 days and which are removed within 10 days after election [sic] to which they pertain.").[3] The ordinance therefore made three different kinds of speech distinctions: (1) Within commercial speech, it distinguished between on-premise and off-premise commercial speech; (2) within non-commercial speech, it distinguished between various categories of non-commercial speech; and (3) most broadly, it treated commercial speech differently from non-commercial speech. All three of those distinctions were challenged.

A fractured Court unambiguously held that the city could discriminate between on- and off-premise commercial speech.[4] The Court began by noting that commercial speech enjoys lesser, intermediate-scrutiny constitutional protection. Commercial speech restrictions are evaluated under the four-part framework established in *Central Hudson Gas & Electric Corp. v. Public Service Commission*, 447 U.S. 557 (1980):

---

[3] *Metromedia*, 453 U.S. at 495-96 & n.3. "Thus, under the ordinance (1) a sign advertising goods or services available on the property where the sign is located is allowed; (2) a sign on a building or other property advertising goods or services produced or offered elsewhere is barred; (3) noncommercial advertising, unless within one of the specific exceptions, is everywhere prohibited. The occupant of property may advertise his own goods or services; he may not advertise the goods or services of others, nor may he display most noncommercial messages." *Id.* at 503.

[4] Justice White wrote the plurality opinion, which was joined in full by Justices Stewart, Marshall and Powell. Justice Brennan authored a concurring opinion joined by Justice Blackmun. Justice Stevens's partial concurrence agreed with the plurality's discussion of commercial speech but dissented from the discussion of non-commercial speech. Justice Rehnquist and Chief Justice Burger each dissented separately.

(1) The First Amendment protects commercial speech only if that speech concerns lawful activity and is not misleading. A restriction on otherwise protected commercial speech is valid only if it (2) seeks to implement a substantial governmental interest, (3) directly advances that interest, and (4) reaches no further than necessary to accomplish the given objective.

*Metromedia,* 453 U.S. at 507 (citing *Cent. Hudson,* 447 U.S. at 563-66).

The Court acknowledged that the ordinance targeted signs that advertised lawful activity and were not misleading. It found that the city's goal of ameliorating traffic hazards and aesthetic unpleasantness was a sufficiently substantial interest. On the fourth prong, it concluded that the city had not gone further than necessary to advance its interest.[5]

The Court therefore focused on whether the regulation directly advanced the city's objectives. The plaintiff argued that banning off-site commercial billboards would not further the city's interests, given that indistinguishable on-site advertising was allowed. The Court rejected that argument, holding that the First Amendment does not prohibit the city from choosing to "value one kind of commercial speech––onsite advertising––more than another kind of commercial speech––offsite advertising." *Id.* at 512. Accordingly, the city constitutionally could conclude that its interests in aesthetics and safety outweigh low-value off-site advertising but should yield to higher-value onsite advertising. *Id.*

The plurality struck down the ordinance's attempt to distinguish among various non-commercial messages, explaining that non-commercial speech is afforded greater constitutional protection, and "[a]lthough the city may distinguish between the relative value of different categories of commercial speech, the city does not have the same range of choice in the area of noncommercial speech to

---

[5] "If the city has a sufficient basis for believing that billboards are traffic hazards and are unattractive, then obviously the most direct and perhaps the only effective approach to solving the problems they create is to prohibit them. The city has gone no further than necessary in seeking to meet its ends. Indeed, it has stopped short of fully accomplishing its ends: It has not prohibited all billboards, but allows onsite advertising and some other specifically exempted signs." *Metromedia*, 453 U.S. at 508.

evaluate the strength of, or distinguish between, various communicative interests." *Id.* at 514 (citations omitted). Therefore, "[b]ecause some noncommercial messages may be conveyed on billboards throughout the commercial and industrial zones, San Diego must similarly allow billboards conveying other noncommercial messages throughout those zones." *Id.*

Finally, the plurality concluded that the ordinance could not favor on-premise advertising over non-commercial speech, because the First Amendment provides greater protection for non-commercial speech than for commercial speech.[6] Given San Diego's judgment that on-premise commercial speech outweighed its interest in safety and aesthetics, non-commercial speech must also outweigh that interest. Thus, "[i]nsofar as the city tolerate[d] billboards at all, it [could not] choose to limit their content to commercial messages; the city may not conclude that the communication of commercial information concerning goods and services connected with a particular site is of greater value than the communication of noncommercial messages." *Id.* at 513.

In summary, *Metromedia* established three key propositions. It held that (1) a billboard ordinance may permit on-premise commercial advertisement while banning off-premise commercial advertisement; (2) the ordinance may not distinguish among non-commercial messages on the basis of their content; and (3) where a city permits commercial billboards, it must also permit non-commercial ones.

## B.

Twelve years after *Metromedia,* the Court revisited the issue of discriminating between commercial and non-commercial speech in *Discovery Network*. There, the City of Cincinnati was concerned about the proliferation of newsracks

---

[6] See *id.* at 513 n.18 (criticizing courts that "have failed to give adequate weight to the distinction between commercial and noncommercial speech and to the higher level of protection to be afforded the latter.").

on city sidewalks. Rather than pass a new ordinance to address the issue, it began aggressively enforcing an old ordinance that outlawed commercial handbills. *Discovery Network*, 507 U.S. at 417. The city used the ordinance to remove newsracks that distributed commercial material, but it did not take any action to restrict identical newsracks that contained non-commercial material.

Because the ordinance was a regulation of commercial speech, the Court again applied the *Central Hudson* four-part test. This time, however, it focused on the fourth prong, which requires the city to demonstrate that the ordinance "is not more extensive than is necessary to serve" the asserted interest. *Cent. Hudson*, 447 U.S. at 566.

The court found that Cincinnati had not "establish[ed] the reasonable fit we require" to satisfy that prong. *Discovery Network*, 507 U.S. at 417 (quoting *Bd. of Trs. of State Univ. v. Fox*, 492 U.S. 469, 480 (1989)). The Court first noted that the ordinance pre-existed the newsrack problem and was originally designed to combat the unrelated problem of handbill littering. Further, "the city failed to address its recently developed concern about newsracks by regulating their size, shape, appearance, or number[, which] indicates that it has not 'carefully calculated' the costs and benefits associated with the burden on speech imposed by its prohibition." *Id*. (quoting *Fox*, 492 U.S. at 480). The Court also pointed out that non-commercial newsracks far outnumbered commercial newsracks:

> The benefit to be derived from the removal of 62 [commercial] newsracks while about 1,500-2,000 [non-commercial newsracks] remain in place was considered 'minute' by the District Court and 'paltry' by the Court of Appeals. We share their evaluation of the 'fit' between the city's goal and its method of achieving it.

*Id*. at 417-18.

The Court then rejected, in detail, the city's argument that there was a reasonable fit between the ban on commercial newsracks "and its interests in

7

safety and esthetics because every decrease in the number of such dispensing devices necessarily effects an increase in safety and an improvement in the attractiveness of the cityscape." *Id.* at 418. That argument relied on the premise that the city could treat commercial and noncommercial speech differently based on the relatively lower value of the former. But that justification put "too much importance on the distinction between commercial and noncommercial speech," which "bears no relationship *whatsoever* to the particular interests that the city has asserted." *Id.* at 424. The commercial and noncommercial newsracks were identical and so were "equally at fault." *Id.* at 426.

The Court therefore concluded that "[i]n the absence of some basis for distinguishing between" commercial and noncommercial newsracks "that is relevant to an interest asserted by the city," the commercial newsrack ban was unjustified, because "the city [had] not established the 'fit' between its goals and its chosen means[.]" *Id.* at 428. The holding was "narrow," because it did "not reach the question whether, given certain facts and under certain circumstances, a community might be able to justify differential treatment of commercial and noncommercial newsracks." *Id.*

## C.

RTM relies heavily on *Discovery Network* and argues that Houston has failed to articulate any reason for distinguishing between commercial and noncommercial billboards relevant to safety and aesthetics. As with the newsracks in *Discovery Network*, there is little here that physically differentiates commercial from non-commercial billboards. RTM also interprets *Metromedia* as supporting its position, because there the Court disapproved of an attempt to treat commercial and non-commercial billboards differently.

Houston argues that *Discovery Network* is distinguishable, because here, there is a much better fit between the ordinance and the asserted interest: Com

mercial billboards make up the vast majority of signs targeted by the ordinance, so the benefit from the ordinance is not "paltry" or "minute." The city also says that *Metromedia* endorsed the approach of regulating commercial signs while permitting non-commercial ones.[7]

Houston is correct. *Discovery Network* plainly indicates that the "minute" benefit produced by the ordinance was critical to its invalidation.[8] Further, the Court addressed the lack of difference between commercial and noncommercial newsracks only after agreeing with the district and appellate courts that the Cincinnati ordinance would have a minimal impact on aesthetics and safety. *Discovery Network*, 507 U.S. at 417-18. Finally, the Court stated that its holding was narrow and applies only where a city has failed to provide a justification for its differential treatment. *Id.* at 428. In short, *Discovery Network* held that because the city could not justify banning commercial newsracks based on the severity of their contribution to the city's problems (either from number or particularized harm), the city could not resort instead to an irrelevant devaluation of commercial speech.

That is not the case with Houston's sign code. As the district court cor-

---

[7] *See id.* at 521 n.26 ("Since our judgment is based essentially on the inclusion of non-commercial speech within the prohibitions of the ordinance, *the California courts may sustain the ordinance by limiting its reach to commercial speech*, assuming the ordinance is susceptible to this treatment.") (emphasis added).

[8] In addition to the discussion in part III.B, *supra*, *see also Discovery Network,* 507 US. at 418 ("We accept the validity of the city's proposition [that every decrease in the number of newsracks necessarily effects an increase in safety and esthetics], but consider it an insufficient justification for the discrimination against respondents' use of newsracks that are no more harmful than the permitted newsracks, *and have only a minimal impact on the overall number of newsracks on the city's sidewalks*.") (emphasis added); *id.* at 426 (referring to "the fallacy of the city's argument that a reasonable fit is established by the mere fact that the entire burden imposed on commercial speech by its newsrack policy *may in some small way* limit the total number of newsracks on Cincinnati's sidewalks.") (emphasis added); *id.* at 427 (observing that in a related commercial speech case, "the fact that the regulation 'provide[d] only the most limited incremental support for the interest asserted'—that it achieved only a 'marginal degree of protection' for that interest—supported our holding that the prohibition was invalid.") (quoting *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 73 (1983)).

rectly noted, the Houston code differs from the ordinance on almost all the "reasonable fit" considerations mentioned in *Discovery Network*. First, the handbill ordinance pre-existed newsracks and was designed to combat littering rather than clutter; Houston's sign code was specifically crafted to address the safety and aesthetic concerns associated with billboards. Second, Cincinnati failed to regulate newsracks' size, shape, appearance, or number; the sign code establishes rules about all four. Finally, and most importantly, Houston produced substantial evidence that (1) the vast majority of area billboards are commercial, and (2) the sign code has been effective, reducing signage by approximately half over a twenty-eight-year period.[9]

Thus, Houston has demonstrated that its approach to ameliorating the billboard problem is "carefully calculated" and that, because of their number, commercial billboards pose a greater nuisance than do noncommercial ones. Unlike Cincinnati, Houston does not need to justify its regulatory approach merely by placing a lower value on commercial speech. The sign code is therefore

---

[9] Houston submitted an affidavit from its sign administrator describing city records about the number of sign fixtures and sign faces over time. RTM objected to her testimony as hearsay, but the court admitted it under the business records exception of Federal Rule of Evidence 803(6). RTM renews the objection on appeal.

We review evidentiary decisions for abuse of discretion. *Johnson v. Ford Motor Co.*, 988 F.2d 573, 578 (5th Cir. 1993). RTM argues that the sign administrator testified about a twenty-eight-year period based on only two reports, which "belies the claim that it was a 'regular practice' of the City to make" those reports. As the city points out, however, it actually "produced to RTM twenty-six boxes of Sign Administration records that included hundreds of similar database reports[.]"

RTM also complains that, during the sign administrator's in-court testimony, she referred to the 1986 ETJ sign data as a "common knowledge number" that was just an estimate by her predecessor. But the administrator's affidavit stated that the number of signs in the ETJ in 1986 was "at least 5058 off-premise structures" based on business records; the in-court testimony RTM complains about is her estimate that the true number was closer to 7000. The district court did not abuse its discretion. And regardless of the precise numbers, it is plain that Houston's code has had more than a "minute" or "paltry" effect on the number of billboards.

constitutional.[10]

## IV.

RTM appeals the district court's decision to abstain.[11] The city replies that RTM waived its objections to abstention by failing to address the issue after its reply in favor of a preliminary injunction. Again, the city is correct.

When RTM moved for injunction, the city argued in response that the district court should abstain. RTM replied that the court should not abstain, because (1) abstention is disfavored where the court is adjudicating First Amendment claims, (2) abstention is inappropriate where criminal prosecution has not commenced, and (3) abstention does not apply where the state court proceeding is brought in bad faith for the purpose of harassment.

The district court granted a preliminary injunction in September 2007 but explained that it would not abstain, because "facial challenges to statutes on First Amendment grounds have been exempted from the abstention doctrine[.]"[12] As a result of the court's announced intent to proceed, RTM and the city filed a joint motion to stay state court proceedings in October 2007.

---

[10] This conclusion accords with the one other circuit court decision that has directly confronted the same issue. *See Riel v. City of Bradford*, 485 F.3d 736, 753 (3d Cir. 2007) ("There is not a similar fit problem in the instant case. As the City has explained, 'the vast majority of signs within the City and the Historic District are commercial signs, and such signs tend to be erected for longer periods of time and tend to be larger and more elaborate in design.' Thus, regulating those signs directly advances the interests asserted by the City, and the provisions do not fall because of the holding in *Discovery Network*.").

[11] The district court exercised *Younger* abstention in deference to the pending state civil suit brought by Houston against RTM before this federal litigation. "Although *Younger* abstention originally applied only to criminal prosecutions, *see Younger v. Harris*, 401 U.S. 37 (1971), following *Pennzoil Co. v. Texaco Inc.*, 481 U.S. 1, 10-11 (1987), it also applies 'when certain civil proceedings are pending, if the State's interests in the proceeding are so important that exercise of the federal judicial power would disregard the comity between the States and the National Government.'" *Health Net, Inc. v. Wooley*, 534 F.3d 487, 494 (5th Cir. 2008).

[12] *See Dombrowski v. Pfister*, 380 U.S. 479, 489-90 (1965) ("We hold the abstention doctrine is inappropriate for cases . . . where . . . statutes are justifiably attacked on their face as abridging free expression[.]").

Three months later, the city moved for summary judgment, arguing that the district court should abstain on "RTM's remaining non-First Amendment claims." RTM's response to that motion, filed February 2008, does not mention abstention. RTM filed its own motion for summary judgment in May 2008, which did not mention abstention. The city's response again asked the court to abstain on the non-First Amendment claims. RTM's June 2008 reply did not respond to those abstention arguments.

The district court granted summary judgment for the city in September 2008; in that order, it also granted abstention. At the time the order issued—and despite the city's repeated request that the court abstain—the last (and only) argument RTM had made regarding abstention was over a year before in its reply in support of the preliminary injunction.

On appeal, RTM makes a number of arguments against abstention that it never presented to the district court. It primarily contends that abstention is inappropriate because the state court proceedings had been stayed pending resolution of the federal suit. RTM failed not only to raise that point in district court but also to even bring the stay to that court's attention. Instead, it requests that we take judicial notice of the stay on appeal.

We will not reverse a district court based on issues not presented to it.[13] At best, then, we should consider only the arguments presented by RTM in its preliminary-injunction reply.[14] The single argument made both to the district court and this panel is that abstention is not appropriate because Houston has acted in bad faith. But "[t]he bad faith exception is narrow and is to be granted parsimoniously." *Wightman v. Tex. Supreme Ct.*, 84 F.3d 188, 190 (5th Cir.

---

[13] *See Miller v. Nationwide Life Ins. Co.*, 391 F.3d 698, 701 (5th Cir. 2004) ("We have frequently said that we are a court of errors, and that a district court cannot have erred as to arguments not presented to it.").

[14] At worst, we should not consider RTM's arguments at all, given that it repeatedly failed to respond to the city's requests for abstention in its summary judgment motions.

1996). Further, more than an allegation of bad faith is required; the accuser must "must offer some *proof*." *Id*. at 191. RTM did not bear its burden of proof in the district court, where it submitted only the conclusional allegation that bad faith is "a description that fits both the state court civil suit against RTM and the threatened citation and prosecution of its advertisers."

Finally, RTM avers that the city waived its abstention argument by conducting full discovery and fully briefing the merits of the case in its various motions. As discussed above, however, the city consistently requested that the district court abstain.[15]

Because the sign code does not violate the First Amendment, and RTM has waived its arguments against abstention, the summary judgment is AFFIRMED.

---

[15] *See O'Neill v. Coughlan*, 511 F.3d 638, 642 (6th Cir.) (explaining that for a state to waive *Younger* abstention, it must do so explicitly and rejecting the argument that "any request that the federal court reach the merits of the lawsuit constitutes waiver"), *cert. denied*, 129 S. Ct. 570 (2008).