# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 12-10574

United States Court of Appeals
Fifth Circuit

**FILED**

January 15, 2014

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff - Appellee

v.

MATTHEW NORMAN SIMPSON; NATHAN TODD SHAFER,

Defendants - Appellants

Appeals from the United States District Court
for the Northern District of Texas

Before OWEN, SOUTHWICK, and GRAVES, Circuit Judges.

JAMES E. GRAVES, JR., Circuit Judge:

Matthew Simpson and Nathan Shafer raise multiple challenges to their convictions and sentences for participation in a wire and mail fraud conspiracy in the telecommunications industry. Simpson was also convicted of aiding and abetting the transmission of spam, obstruction of justice, and registration of a false domain name. We affirm all the convictions, except for Simpson's conviction for registration of a false domain name. We also affirm Shafer's sentence. However, we vacate and remand Simpson's sentence in light of our reversal of one of his convictions.

No. 12-10574

## I.  Factual and Procedural Background

Nineteen co-defendants, including Simpson and Shafer, were indicted in 2009 for their involvement in a lengthy conspiracy to defraud telecommunications companies and other entities.  Count One of the fourth superseding indictment charged both Simpson and Shafer (along with other co-defendants) with conspiracy to commit wire and mail fraud in violation of 18 U.S.C. §§ 1341, 1343, and 1349.  The indictment charged that the defendants, beginning in March 2003 and continuing through January 2010, engaged in a conspiracy to fraudulently obtain property and services relating to telecommunications and the use of computers.  Count Two charged Simpson with aiding and abetting violations of 18 U.S.C. § 1037, which prohibits persons from sending bulk commercial email messages with the intent to deceive recipients and internet service providers about the origin of the messages.  Count Four charged Simpson with obstruction of justice by destruction of evidence in violation of 18 U.S.C. § 1512(c)(1).  Count Seven charged Simpson with false registration of a domain name, and alleged that he used that domain in the course of the conspiracy. 18 U.S.C. § 3559(g)(1).

Trial evidence showed that the defendants and their co-conspirators conspired to defraud various telecommunications companies, lessors, creditors, credit reporting agencies, and various other service providers, of goods and services. Evidence showed that beginning in 2003, the co-conspirators were involved in the creation and/or operation of a series of corporate entities which defrauded telecommunications companies, including, *inter alia*: American Discount Telecom (ADT), a company that promulgated a method of using routing codes that made long distance or toll-free calls appear to be local calls, thus avoiding paying larger telephone service providers for use of their networks; TxLink, a wholesale dialup internet company which Simpson used to steal network capacity and divert customer payments from one of his

2

employers, CommPartners; camophone.com, a spoofing service that allowed customers to disguise the number they were calling from, which allowed spoofed calls to be routed locally through toll-free lines, thereby avoiding paying fees for the calls; ColoExchange, a colocation company that Simpson used to engage in both lease fraud and insurance fraud; Aston Technology, a company that Michael Faulkner, a co-conspirator, pretended to control to obtain network capacity without paying for it; and Union Datacom (UDC), Premier Voice, Lone Star Power, Incavox, and several other corporate entities that entered into contracts for commercial telecommunications services, leases, and other agreements for goods and services, which were not paid for. The companies were then abandoned or renamed by the co-conspirators to avoid the debts. Evidence showed that the defendants provided false identity information and postal addresses; provided false credit histories, bills, invoices, financial statements, and credit references; and used assumed identities in applications and contracts in order to hide their association with the shell corporate entities and with each other.

Most of the co-conspirators pleaded guilty. Four co-conspirators went to trial. After a ten-week trial, Simpson was convicted on one count of conspiracy to commit wire fraud and mail fraud (Count One), one count of fraud and related activity in connection with electronic mail (Count Two), one count of obstruction of justice through destruction of evidence (Count Four), and one count of false registration of a domain name (Count Seven). He was acquitted on an additional count of obstruction of justice. Shafer was convicted on one count of conspiracy to commit wire fraud and mail fraud (Count One). The two additional co-defendants at trial were acquitted.

The district court sentenced Simpson to 240 months on Count One; 36 months on Count Two, to run concurrent; 240 months on Count Four, to run consecutive to Count One; and 84 months on Count Seven, to run concurrent,

No. 12-10574

for a total of 480 months in prison. The district court ordered Simpson to pay restitution in the amount of $17,674,704. The district court sentenced Shafer to 108 months in prison on Count One and ordered restitution in the amount of $3,262,909.50. The court also entered an order of forfeiture against each defendant. The defendants appealed.

## II.  Discussion

Simpson and Shafer raise multiple challenges to their convictions and sentences. We address each of their arguments in turn.

*A.     Adequacy of Count One (Simpson)*

Simpson first argues that the indictment was too indefinite on Count One. We review the sufficiency of the indictment de novo. *United States v. Cooper*, 714 F.3d 873, 876 (5th Cir. 2013). "An indictment is legally sufficient if (1) each count contains the essential elements of the offense charged, (2) the elements are described with particularity, and (3) the charge is specific enough to protect the defendant against a subsequent prosecution for the same offense." *Id.* at 877 (5th Cir. 2013) (internal quotation marks omitted) (quoting *United States v. Threadgill*, 172 F.3d 357, 366 (5th Cir. 1999)). Simpson does not describe these standards or explain how they are not met, but generally argues that the indictment purports to cover a single seven-year conspiracy by various different groups of co-conspirators to defraud multiple entities, but that no overarching agreement is described.

We find that the indictment met the required standards. The elements of conspiracy under 18 U.S.C. § 1349 are: (1) two or more persons made an agreement to commit an unlawful act; (2) the defendant knew the unlawful purpose of the agreement; and (3) the defendant joined in the agreement willfully, with the intent to further the unlawful purpose. *See United States v. Grant*, 683 F.3d 639, 643 (5th Cir. 2012). "An agreement may be inferred from concert of action, voluntary participation may be inferred from a collection of

4

circumstances, and knowledge may be inferred from surrounding circumstances." *Id.* (quoting *United States v. Stephens*, 571 F.3d 401, 404 (5th Cir. 2009)). The elements of mail fraud under 18 U.S.C. § 1341 are: "(1) a scheme to defraud; (2) use of the mails to execute the scheme; and (3) the specific intent to defraud." *Id.* The elements of wire fraud under 18 U.S.C. § 1343 are: "(1) a scheme to defraud and (2) the use of, or causing the use of, wire communications in furtherance of the scheme." *United States v. Stalnaker*, 571 F.3d 428, 436 (5th Cir. 2009). Count One contained the essential elements of the wire and mail fraud conspiracy offenses, and described them with sufficient particularity and specificity. It stated the manner and means of the conspiracy, including, *inter alia*, that defendants acted in concert to make false representations to obtain services and property, create and use shell companies to hide identities and relationships, and use false postal addresses, and took various other steps to hide their true identities and their relationships to the various involved companies. The indictment listed over 140 overt acts as part of the conspiracy, including fraudulent misrepresentations by Simpson in mailings, emails and telephone calls in furtherance of the scheme. Count One is broad, describing many instances of wire and mail fraud by the defendants, but it is not vague or indefinite.

*B.    Conspiracy (Simpson and Shafer)*

Both defendants argue that there is insufficient evidence supporting their conviction of conspiracy to commit wire and mail fraud. We review the sufficiency of the evidence de novo. *See United States v. Shum,* 496 F.3d 390, 391 (5th Cir. 2007). "When reviewing the sufficiency of the evidence, we view all evidence, whether circumstantial or direct, in the light most favorable to the government, with all reasonable inferences and credibility choices to be made in support of the jury's verdict." *United States v. Ford*, 558 F.3d 371, 375 (5th Cir. 2009).

*1.    Simpson*

Simpson argues that the evidence is insufficient because: (1) the trial evidence did not prove the existence of a single conspiracy as alleged in the indictment; (2) his relationship with Michael Faulkner was a "buyer-seller" relationship, and thus he could not be held liable for Faulkner's business misconduct; and (3) evidence of fraudulent regulatory filings became the "gravamen" of the conspiracy, in violation of *Cleveland v. United States*, 531 U.S. 12 (2000).  We address each argument in turn.

a.    Single Conspiracy

"The question whether the evidence establishes the existence of one conspiracy (as alleged in the indictment) or multiple conspiracies is a fact question within the jury's province." *United States v. Mitchell*, 484 F.3d 762, 769 (5th Cir. 2007).  "We will affirm the jury's finding that the government proved a single conspiracy 'unless the evidence and all reasonable inferences, examined in the light most favorable to the government, would preclude reasonable jurors from finding a single conspiracy beyond a reasonable doubt.'" *Mitchell*, 484 F.3d at 769 (quoting *United States v. Morris*, 46 F.3d 410, 415 (5th Cir. 1995)).

The principal considerations in counting the number of conspiracies are (1) the existence of a common goal; (2) the nature of the scheme; and (3) the overlapping of the participants in the various dealings. *Id.* at 770.  "This court has broadly defined the criterion of a common goal in counting conspiracies." *Id.*  For example, in *Morris*, we held that the common goal of profiting from the illicit business of buying and selling cocaine constituted a single conspiracy. *Morris*, 46 F.3d at 415.  Likewise, the jury here could reasonably have concluded that the common goal of the charged conspiracy was to derive personal gain from the creation of shell companies and other fraudulent actions to defraud telecommunications companies out of services and property.

No. 12-10574

Regarding the nature of the scheme, "the existence of a single conspiracy will be inferred where the activities of one aspect of the scheme are necessary or advantageous to the success of another aspect or to the overall success of the venture, where there are several parts inherent in a larger common plan." *Id.* at 416. Here, the jury could reasonably have found "several parts inherent in a larger common plan," in which the fraud scheme was dependent on various conspirators continuing to perform their functions. Some co-conspirators created shell companies or falsified documents, while some used those companies or false documents to obtain telecommunications services, and some used their positions or expertise in various ways to avoid detection and to avoid paying the bills. Finally, the third criterion "examines the interrelationships among the various participants in the conspiracy." *Id.* The more interconnected the relationships, the more likely it is that there is a single conspiracy. *See id.* Here, there was evidence of Simpson's repeated concerted action with a core group of co-conspirators, including with Faulkner, who Simpson alleges was the primary perpetrator of fraud. Though the other players in the conspiracy changed over time, the jury could reasonably have found that Simpson was consistently involved with core conspirators to defraud companies of goods and services. William Watts, a primary actor in the conspiracy, testified that Simpson was part of the "inner circle." Jason Watts, another conspirator, testified that Simpson and Faulkner acted in concert to set up shell companies, shared databases, and worked together in their business arrangements. In sum, Simpson is particularly poorly positioned to contest the proof of a single conspiracy, when the evidence supports the conclusion that he was consistently near the center of the scheme.

   b.    <u>Buyer-Seller Relationship</u>

   Simpson next argues that the evidence showed that he had a buyer-seller relationship with Faulkner, rather than a co-conspirator relationship, and that

he cannot be held liable for Faulkner's business dealings. Simpson provides no evidentiary support for this assertion. By contrast, the government points to multiple pieces of trial evidence that showed, *inter alia*, that Faulkner described Simpson as part of the infrastructure that he managed, and split profits with Simpson for at least several months. Jason Watts testified that Simpson and Faulkner acted in concert, shared information and worked together in their business arrangements. Though Simpson challenged these assertions at trial, judging the credibility of the evidence was the province of the jury.

     c.    <u>Regulatory Filings</u>

Simpson next argues that the evidence supporting the conspiracy charge was drawn largely from fraudulent regulatory filings, in violation of *Cleveland v. United States,* 531 U.S. 12 (2000). *Cleveland* held that the federal mail fraud statutes do not extend to fraudulent filings seeking licenses from public entities. *Id.* at 20-21. Simpson summarily argues that fraudulent regulatory filings became the basis for a theory of prosecution. Although fraudulent regulatory filings were included in the evidence for various purposes, we have already detailed substantial evidence, not including those filings, which supports his conviction. Further, the district court repeatedly emphasized to the jury, including in the final jury charge, that it could not convict Simpson on the basis of regulatory filings or violations.

Simpson has not shown that a reasonable juror could not have found that he was guilty of all the elements of conspiracy beyond a reasonable doubt.

    *2.    Shafer*

Shafer also argues that there is insufficient evidence supporting his conviction for conspiracy to commit wire and mail fraud. Shafer never disputed that he recruited people without assets to be directors of shell corporations on behalf of Faulkner. Shafer's contention is that Faulkner told him that he was

No. 12-10574

exploiting a "legal loophole" in the regulatory framework, and that their business practices were legal.  In short, Shafer argues that he had no intention to further any unlawful objective of the conspiracy, and that the government never established that he did.

As we stated above, to prove conspiracy, "the government must prove beyond a reasonable doubt that an agreement existed to violate the law and each conspirator knew of, intended to join, and voluntarily participated in the conspiracy." *United States v. Chon*, 713 F.3d 812, 818 (5th Cir. 2013).  "The existence of an agreement to violate the law may be established solely by circumstantial evidence and may be inferred from 'concert of action.'" *Chon*, 713 F.3d at 818-19.  Finally, "[w]hile a conspirator must knowingly participate in some way in the larger objectives of the conspiracy, he does not need to know all details of the unlawful enterprise or have a major role in the unlawful enterprise." *Id.* at 819.

Shafer cannot show that there was insufficient evidence that he joined the conspiracy.  There is evidence that he knew of the unlawful purpose of the conspiracy, and acted in concert with the other conspirators to carry it out. *See Chon*, 713 F.3d at 818-19.  Shafer himself acknowledges that William Watts, a co-conspirator, testified that Shafer was at a meeting where four co-conspirators, including Faulkner, Simpson, Watts and Shafer, planned to use the shell companies to acquire telecommunications services and not pay for them.  Watts also described Shafer as being part of "inner circle" during the time that he was involved in the conspiracy.  Though Shafer attacks Watts' credibility and inability to remember the exact date and details of the meeting, the jury is, of course, the best judge of credibility.  Shafer has not shown that a reasonable juror could not have found that he was guilty of all the elements of conspiracy beyond a reasonable doubt.

*C.    Spam (Simpson)*

Simpson next argues that his conviction for aiding and abetting the transmission of spam under 18 U.S.C. § 1037(a)(2), a provision of the CAN-SPAM Act, is invalid, because the statute is unconstitutionally vague and overbroad under the First Amendment. Alternatively, he argues that the evidence supporting this conviction is insufficient.

Simpson is correct that commercial speech receives First Amendment protection, if the commercial speech is not false, deceptive or misleading. *See Bolger v. Youngs Drugs Prods. Corp.*, 463 U.S. 60, 69 (1983). However, misleading commercial speech receives no First Amendment protection. *See RTM Media v. City of Houston*, 584 F.3d 220, 224 (5th Cir. 2009). Section 1037 provides in relevant part:

> "(a) In general. – Whoever, in or affecting interstate or foreign commerce, knowingly . . . (2) uses a [computer used in interstate commerce] to relay or retransmit multiple commercial electronic mail messages, with the intent to deceive or mislead recipients, or any Internet access service, as to the origin of such messages . . . shall be punished[.]"

18 U.S.C. § 1037(a)(2). The statute also includes a minimum volume of messages that must be sent within a single day, month, or year to be punishable under the statute. *Id.* § 1037(d)(3). There is very little case law interpreting this statute. However, the subsection of § 1037 that Simpson was convicted under is expressly limited to "commercial" electronic mail that is sent "with the intent to deceive or mislead recipients, or any Internet access service, as to the origin of such messages." 18 U.S.C. § 1037(a)(2). Given that the statute specifically targets and punishes only unprotected, intentionally misleading commercial speech, and thus excludes commercial speech that is not misleading and all political or charitable speech, we conclude that it is not facially vague or overbroad.

No. 12-10574

Regarding his assertion that the evidence supporting the conviction is insufficient, Simpson has clearly failed to show that no reasonable juror could have found him guilty. He primarily argues that the CAN-SPAM Act reaches only email, but that his conviction was based on evidence of phone and fax spam. The statute prohibits the transmission of misleading "commercial electronic mail messages." § 1037(a)(2). The district court specifically instructed the jury that "electronic mail message" meant "a message sent to a unique electronic mail address." There is no basis to conclude that the jury could have thought that "electronic mail address" meant a phone or fax number, as opposed to an email address. Further, there is sufficient evidence supporting Simpson's conviction of aiding and abetting spam based on the email messages. The government points to evidence showing that UDC, a company run by Faulkner, had many customers who sent spam. In 2006, an employee of UDC asked Simpson—who was then working at TxLink—to give him information about a server he could use to help push spam traffic through, and Simpson provided server information to the employee. Further, trial evidence showed that Simpson was involved in hiding spam from service providers. Evidence showed that after some spam complaints were received, Simpson told Faulkner not to bother rerouting spam traffic around TxLink's network connection with Level 3, a service provider, because the spam cop could not tell what connection the spam was coming from. Simpson then told Faulkner and another employee how to adjust the system so that the provider, Level 3, would no longer receive copies of the spam complaints. Given this evidence, Shafer has not shown that no reasonable juror could have found him guilty of aiding and abetting the transmission of spam.

D.    *Obstruction of Justice (Simpson)*

Simpson next argues that there is insufficient evidence supporting his conviction for obstruction of justice. 18 U.S.C. § 1512(c)(1) provides that

"Whoever corruptly. . . alters, destroys, mutilates, or conceals a record, document, or other object, or attempts to do so, with the intent to impair the object's integrity or availability for use in an official proceeding" shall be punished. This conviction was based on Simpson's deletion of his electronic communication with Faulkner after search warrants for Faulkner's home and offices were executed. Simpson argues that "mere deletion of email" is insufficient to convict under this section, and that the government did not prove the deletion was in connection with any particular proceeding as required by the statute.

Simpson cites no support for his assertion that deleting electronic communication in response to being told about the execution of search warrants at a co-conspirator's home and office is insufficient to support a conviction of obstruction of justice. Further, there is evidence that Simpson did more than simply delete emails. Simpson told the FBI agents that he had become concerned by the search warrants and Faulkner's advice to him to hide his assets and had deleted the communications. When asked for the drives that the communications had been deleted from, Simpson told the agents that the drive had failed and that he tried to reformat the drive, which would make data harder to recover. When the agents wanted the drive anyway, Simpson said that it had been part of an array (a set up in which two drives must be read together), and that he no longer had the other part of the array. Simpson did provide the drive to the agents. The agent who analyzed the drive testified that it had no usable data on it, and it was as if the data had been "splashed all over the drive," supporting the inference that Simpson did more than simply remove emails from his inbox.

Simpson also argues that there was an insufficient connection between the deletion of the email and an official proceeding. Though a proceeding need not be actually pending at the time of the obstructive act, 18 U.S.C. § 1512(f),

an obstruction of justice conviction requires some "nexus" between the obstructive act and some official government proceeding, *see Arthur Andersen LLP v. United States*, 544 U.S. 696, 707-08 (2005); *United States v. Aguilar*, 515 U.S. 593, 599-600 (1995).  A proceeding must at least be "foreseen," such that the defendant has in contemplation some particular official proceeding in which the destroyed evidence might be material. *See Arthur Andersen*, 544 U.S. at 707-08; *see also United States v. Gordon*, 710 F.3d 1124, 1151-52 (10th Cir. 2013); *United States v. Johnson*, 655 F.3d 594, 606 (7th Cir. 2011).

We find that this requirement was satisfied here.   Simpson admitted that he deleted the emails after learning about the executed search warrants. Simpson also instructed Cargill, an employee and co-conspirator, to delete anything she thought ought to be deleted from her computer, anticipating that their company would also be investigated.  This provided sufficient evidence of Simpson's intent to interfere with the administration of justice at an official proceeding that he anticipated would occur, and which had already begun with the execution of the first search warrants.

E.    *False Registration of a Domain Name (Simpson)*

Simpson next argues that his conviction for false registration of a domain name under 18 U.S.C. § 3559(g), a penalty enhancement provision, is barred by the Ex Post Facto Clause and the statute of limitations, or was not supported by sufficient evidence.

Section 3559(g) provides that if a defendant convicted of a felony offense "knowingly falsely registered a domain name and knowingly used that domain name in the course of that offense," the maximum term of imprisonment shall be increased by 7 years or doubled, whichever is less. 18 U.S.C. § 3559(g)(1). Simpson's conviction under this section was predicated on his registration of a domain name, camophone.com, which he first registered in October 2004 under the false name of "Stan Brown," using a false address.  The domain name was

renewed in October 2005. Section 3559(g) was not enacted until December 2004. *See* Intellectual Property Protection and Courts Amendments Act of 2004, Pub. L. No. 108-482, § 204, 118 Stat 3912 (2004). Thus, Simpson argues that a conviction based on the registration in October 2004 violates ex post facto principles. He also argues that the indictment was untimely because it was returned in January 2010, outside the five-year statute of limitations. *See* 18 U.S.C. § 3282 (providing the five-year statute of limitations). The government argues that his conviction was based on the October 2005 renewal of the registration, which was after the effective date of the statute and within the statute of limitations.

We need not reach the parties' arguments concerning whether the October 2005 renewal constituted another false registration under the statute, because there is no evidence showing that camophone.com was used in the course of the conspiracy after the October 2005 renewal. Section 3559 was not yet in effect when Simpson registered camophone.com in October 2004. Even assuming that the renewal can be a false registration under the statute, it stands to reason, and statutory construction, that the government is required to prove that camphone.com was used in the course of the conspiracy after it was fraudulently registered, as defined by § 3559(g), i.e. after October 2005. However, the only record evidence the government cites to prove that camophone.com was used in the course of the conspiracy is prior to October 2005. While an AT&T employee referenced testing camophone.com for routing spoofed calls using its toll-free line "into 2005," all the relevant communications occurred between November 2004 and February 2005. In supplemental briefing, in response to our specific question about the use of camophone.com after October 2005, the government points only to a web page archive indicating that camophone.com was still in operation for existing customers (though it had stopped taking new customers) up to 2006. This is

14

no evidence at all that camphone.com was "knowingly used . . . in the course of" the conspiracy, as required by § 3559(g)(1), after October 2005.  Thus, we reverse Simpson's conviction on Count Seven due to insufficient evidence.

In a post-argument brief, the government asserted that even if there was insufficient evidence on this count, it was harmless error because § 3559(g) is a penalty enhancement statute, the 480-month sentence was a downward departure from the statutory maximum of fifty years, and the district court could still have sentenced Simpson to the same 480-month sentence without the § 3559 conviction.  The parties did not address whether erroneous conviction of a penalty enhancement provision can be harmless error, and we do not reach the issue because we find that the error was not harmless.  "[T]he harmless error doctrine applies only if the proponent of the sentence convincingly demonstrates both (1) that the district court would have imposed the same sentence had it not made the error, and (2) that it would have done so for the same reasons it gave at the prior sentencing." *United States v. Ibarra-Luna*, 628 F.3d 712, 714 (5th Cir. 2010).  Here, the district court calculated the statutory maximum at 50 years, and then downwardly departed from that point.  It is not clear from the record that the district court would not have given Simpson a lower sentence if his statutory maximum were lower.  We do not find "evidence in the record that will convince us that the district court had a particular sentence in mind and would have imposed it, notwithstanding the error." *Id.* at 718 (quoting *United States v. Huskey*, 137 F.3d 283, 289 (5th Cir. 1998)).

F.    *Motion for New Trial (Simpson)*

Simpson next argues that the district court erred when it denied his motion for a new trial, based on the newly disclosed fact that AT&T was being sued by the United States for fraudulent billing for international phone calls made by Nigerian spammers. He also argues that failure to disclose this

previously sealed lawsuit against AT&T before trial violated *Brady v. Maryland*, 373 U.S. 83 (1963).  Simpson argues that he would have used this evidence to impeach two AT&T witnesses who testified at trial.

We review the denial of a motion for a new trial for abuse of discretion. *United States v. Piazza*, 647 F.3d 559, 564 (5th Cir. 2011). A claim that the government suppressed material evidence is reviewed de novo, but with appropriate deference to the district court's factual findings. *See United States v. Brown*, 650 F.3d 581, 589 (5th Cir. 2011).  To either warrant a new trial based on newly discovered evidence or succeed on a *Brady* claim, Simpson must show that the new or withheld evidence is material.  *See United States v. Pena*, 949 F.2d 752, 758 (5th Cir. 1991); *United States v. Ellender*, 947 F.2d 748, 756 (5th Cir. 1991).

Simpson does not persuasively argue how the evidence of fraudulent billing by AT&T as a corporate entity is material.  He argues that the new evidence lent credence to his assertion to Bandwidth.com, when Bandwidth discovered high international usage by Aston, that Aston could have been Nigerian spammers.  However, the evidence in the record shows that what he said to Bandwidth was that Aston was "Nigerian scammers. . . basically," and that the company was based in Nigeria and had changed its name a lot, when in fact he knew that Aston was a company Faulkner and other co-conspirators were fraudulently impersonating.  Further, as the district court stated, the evidence was unlikely to have been impeaching to the two AT&T employees who testified, who were not shown to have any connection to the alleged wrongdoing by AT&T, the corporation. Given that AT&T was one of several companies victimized, Simpson's argument that this impeaching evidence would somehow have altered the whole course of the trial is not persuasive. The district court's denial of a new trial was not an abuse of discretion.

*G.     Rule 404 Evidence (Shafer)*

Shafer next argues that the district court erroneously admitted evidence that he had engaged in mortgage fraud, in violation of Federal Rule of Evidence 404(b). Under Rule 404(b), "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b). At trial, an FBI agent read into the record an email from Shafer's account to a loan officer at Home Run Financial for the purposes of showing the date which Shafer claimed he began working for Crydon Corporation, a company run by Faulkner, and to establish the email address used by Shafer. Though the district court had ruled on a motion *in limine* that extrinsic evidence of mortgage fraud was not admissible, the agent read into the record a part of the email that referenced a loan package. Shafer contends that this sentence revealed to the jury that Shafer was falsely representing his work history on a home loan application, and was thus improper evidence under Rule 404(b).

Shafer preserved this objection, and thus we review the admission of the evidence for abuse of discretion. *See United States v. Templeton,* 624 F.3d 215, 221 (5th Cir. 2010). "We do not reverse for erroneous admissions under Rule 404(b) if the error was harmless." *Id*. We find no reversible error. The single sentence read to the jury concerning a loan application said only: "I'm not sure what the deal is with the loan package." It is doubtful whether this single sentence even revealed to the jury that the email was in relation to a home loan application. Shafer makes no argument about how this single statement affected the weight of the evidence at trial or prejudiced him, arguing only that it should have been redacted. Given the slight weight and unclear meaning of this single sentence and that no further reference to or argument concerning

17

fraud in a home loan application was made during the rest of the trial, the error, if any, was harmless. *See id.* at 221.

*H.    Sentencing (Simpson and Shafer)*

Both Simpson and Shafer raise multiple challenges to their sentences. In reviewing the sentences, first, we consider whether the district court committed a "significant procedural error," such as miscalculating the advisory Guidelines range. *United States v. Odom*, 694 F.3d 544, 547 (5th Cir. 2012). If there is no procedural error or the error is harmless, we proceed to the second step and review the substantive reasonableness of the sentence imposed for an abuse of discretion. *Id.* We review the district court's interpretation and application of the Guidelines de novo, and the district court's factual findings for clear error. *Id.* at 546-47.

*1.    Simpson*

Simpson argues that the sentencing enhancement for perjury was erroneously applied to him.[1] He received a 2-level increase in his offense level for obstruction of justice based on the district court's finding that he had committed perjury during the trial. U.S.S.G. § 3C1.1 provides that the offense level is increased by two levels if the defendant willfully obstructed justice during the prosecution. The application notes provide that this section applies to perjury. § 3C1.1, cmt. n.4(b). "Though the court may not penalize a defendant for denying his guilt as an exercise of his constitutional rights, a sentence may be enhanced if the defendant commits perjury." *United States v. Como*, 53 F.3d 87, 89 (5th Cir. 1995); *see also United States v. Dunnigan*, 507 U.S. 87, 93-95 (1993). The district court specified the testimony it found to be

---

[1] Simpson separately argues that his within-Guidelines sentence of 480 months is substantively unreasonable. In light of our remand of Simpson's sentence due to reversal of Count Seven, we do not express an opinion on the ultimate reasonableness of Simpson's sentence.

perjury, and found by a preponderance of the evidence that in each instance: (1) Simpson gave false testimony; (2) under oath at trial; (3) it was material; (4) Simpson did not believe it to be true; and (5) Simpson gave it with willful intent rather than because of mistake or lack of memory. The court found eight instances of perjury.

Simpson has not shown that the district court clearly erred in its perjury findings. Simpson argues only that much of the testimony that the court found to be perjury related to testimony about his own motives for taking certain actions, or related to "matters concerning which individual perspective and recollection are bound to vary." However, the first instance of perjured testimony found by the court was Simpson's testimony that he did not associate with spammers. This is contradicted by evidence establishing Simpson's association with Faulkner and UDC, who he knew to facilitate spam, and the assistance he gave Faulkner to ensure that service providers would not receive spam complaints. Further, several of the instances of testimony the court found to be perjury concerned specific actions that Simpson had taken to hide his activity or his characterization of his relationship with Faulkner, a core conspirator, including: that he put the name of his girlfriend's mother down as an employee on a license application without her knowledge because she would really have been an employee; that he told Bandwidth.com that Aston Technology were Nigerian spammers, when he knew the spam at issue was coming from Faulkner's impersonation of the company; that he paid Faulkner's mortgage and employees because he generally owed Faulkner money and thought he would be paid back; that he paid for Faulkner to have a consultation with a lawyer because Faulkner had no money and they were friends, and; that he stayed with Faulkner for a period because he thought he could change Faulkner's ways and show him that it is more profitable to run a business by

19

paying vendors.  We cannot conclude that the district court erred in finding that this testimony was intentionally deceptive and materially false.

In any event, it appears that the two levels added by the perjury enhancement would have made no difference to Simpson's Guidelines range. Simpson's offense level was calculated at 45. Any offense level higher than 43 is treated as an offense level of 43.  If there were no perjury enhancement, the offense level would have been 43.  Standing alone—and Simpson does not challenge any other enhancements applied to him—the perjury enhancement did not affect his offense level or Guidelines range.[2]

    2.    *Shafer*

Shafer makes several arguments concerning procedural aspects of his sentence.  First, he argues that the district court clearly erred in determining the loss amount attributable to him.  He also contends that the district court erred in calculating the number of companies that were victims of his conduct. He alternatively argues that if the district court did not factually err in determining the loss amount, it erred by using the preponderance of the evidence standard as opposed to a higher clear and convincing evidence standard.  Lastly, he argues that the court should not have given him two criminal history points for committing the offense while on probation.

---

[2] Simpson also argues that the perjury enhancement somehow proves that his right to a speedy trial was violated.  He seems to be arguing that because the trial took a long time, due to the number of defendants and companies, and involved a substantial amount of discovery and evidence, he cannot have been expected to have an accurate memory of events or to accurately testify to certain details. However, the district court expressly found that the instances of perjury were material misrepresentations, not mere inconsistences.  Simpson also claims that the fact that the judge ordered pre-trial detention shows that the judge pre-judged his guilt.  Simpson has not shown that the district judge was biased or pre-judged him.

a.    <u>Loss Calculation</u>

Shafer contends that the loss amount attributed to him at sentencing pursuant to U.S.S.G. § 2B1.1(b)(1) was too high.  We review the amount of loss, a factual finding, for clear error. *See United States v. Jones*, 475 F.3d 701, 705 (5th Cir. 2007).  Findings of fact for sentencing purposes need only be found by a preponderance of the evidence. *See United States v. Harper*, 448 F.3d 732, 734 (5th Cir. 2006).  The finding must be plausible in light of the record as a whole. *Jones*, 475 F.3d at 705.  The general rule is that the loss amount is the greater of actual or intended loss. U.S.S.G. § 2B1.1(b)(1) & cmt. n.3(A). Actual loss is the "reasonably foreseeable pecuniary harm that resulted from the offense." *Id*. Intended loss is "the pecuniary harm that was intended to result, even if it was impossible or unlikely to occur." *Id*. The district court "need only make a reasonable estimate of the loss." *Id*. cmt. n.3(C).  In the Fifth Circuit, the district court is entitled to rely upon the information in the pre-sentence report (PSR) in making factual determinations at sentencing, as long as the information bears some indicia of reliability. *United States v. Scher*, 601 F.3d 408, 413 (5th Cir. 2010).  If challenging the PSR, the defendant bears the burden of presenting rebuttal evidence to demonstrate that the information in the PSR is inaccurate or materially untrue. *Id*.

Before sentencing Simpson and Shafer, the district court conducted an evidentiary hearing to determine the loss amount attributable to each convicted defendant.  At the hearing, the district court granted several of Shafer's objections to the loss calculation.  It agreed that Shafer would not be held responsible for losses that occurred before he had joined the conspiracy, and excluded several loss amounts because the information supporting the claimed loss amount lacked sufficient indicia of reliability.  The district court rejected Shafer's other objections, finding that the challenged losses were based on sufficiently reliable information and were reasonably foreseeable to

No. 12-10574

Shafer. The total loss attributed to Shafer at sentencing, including the amounts that Shafer does not challenge on appeal, was over $3.2 million.

On appeal, Shafer asserts that the loss figures for several victim companies are unreliable because they were provided without sufficient detail, such that it cannot be determined if the loss occurred after he joined the conspiracy. He points to case law providing that "[b]ald, conclusory statements do not acquire the patina of reliability by mere inclusion in the PSR." *United States v. Elwood*, 999 F.2d 814, 817-18 (5th Cir. 1993). Here, however, the district court did not accept the statements in the PSR as the loss amount. The court conducted a separate evidentiary hearing on that issue, where the case agent testified about the instructions given to the victim companies, the losses the companies identified, and the supporting documentation provided by the companies. The agent was also cross-examined by Simpson's and Shafer's attorneys. The district court considered all this evidence before making its findings regarding the loss amounts. Shafer's speculative assertions that some of the loss amounts might have occurred before he joined the conspiracy are insufficient to meet his burden or to show that the district court clearly erred, particularly given the district court's detailed consideration of the loss calculation.

Further, even if all of Shafer's objections are valid, except for the objection to XO Communications, the error would have been harmless because the offense level would not have changed. A loss of approximately $3,200,000 was attributed to Shafer after the evidentiary hearing; he would have to reduce that amount to less than $2.5 million for his offense level to be reduced. *See* U.S.S.G. § 2B1.1(b)(1)(I), (J). Only the loss to XO Communications is large enough to affect the offense level. Shafer contends, as he did at the evidentiary hearing, that the XO Communications loss of $1,303,439.51 should not be attributed to him because it is not clear when it occurred, and thus it might

have occurred before he joined the conspiracy.  The agent testified at the evidentiary hearing that this portion of XO Communications' losses related to services XO had provided to two companies operated by the co-conspirators, A&B Communications and Incavox.  XO's representative at trial testified that the losses from A&B, which amounted to nearly $270,000, were billed by March 2009.  XO's representative testified that the Incavox losses on two separate accounts, one with a loss around $237,000 and one with a loss of nearly $800,000, were billed by March or April of 2009.  Shafer, pretending to be someone else, signed the XO contract for Incavox in February 2009.  Shafer joined the conspiracy in October 2008.  Though on appeal Shafer questions the bases of these losses, he does not point to any countervailing evidence showing that XO Communications did not suffer those losses.  The district court's findings that these losses occurred after Shafer joined the conspiracy and were reasonably foreseeable to him are not clearly erroneous.

Shafer also objects to certain losses on the basis that they are excluded by U.S.S.G. § 2B1.1(b)(1) cmt. n.3(d), which  provides that "Loss shall not include. . . . interest of any kind, finance charges, late fees, penalties, amounts based on an agreed upon return or rate of return or other similar costs."  AT&T described some portion of its loss as "regulatory/other fees," and CBeyond described some portion of its losses as "service charges and taxes."  Shafer asserts that these losses fall within the text of the exclusionary language.  However, the district court reasoned that the exclusion applies to types of charges that the companies did not actually lose out-of-pocket; for example, late fees that it would have been paid if the clients had paid their bills, as opposed to the billed amount itself.  The court specifically inquired into the bases of the challenged amounts and found that Shafer could not show that the losses fell within the exception or that companies did not actually incur those

23

amounts as losses. We find no basis in the record to conclude that the district court clearly erred.

Shafer also objects to the inclusion of losses that occurred after Faulkner fled the U.S. to Mexico in early 2009, claiming that he was no longer involved in any jointly undertaken criminal activity. Shafer may be correct that he did not take any additional steps to advance the conspiracy, but there is no evidence that he attempted to withdraw from it. *See United States v. Torres*, 114 F.3d 520, 525 (5th Cir. 1997). Mere cessation of activity does not constitute withdrawal from a conspiracy. *See id.* Further, Shafer continued to communicate with Faulkner, including asking that Faulkner pay him for past work, and there was evidence presented at the sentencing hearing indicating that Shafer was aware that Faulkner was continuing his activities. In these circumstances, the district court's findings that the continued losses were the result of the jointly undertaken activity and were foreseeable to Shafer are not clearly erroneous.

In sum, after reviewing the record, we find no basis on which to conclude that the district court clearly erred in calculating the loss amounts attributable to Shafer. [3]

b.    Evidentiary Standard

Shafer next argues that where the loss calculation increased his Guidelines range from 8-14 months to 97-121 months, due process requires a higher burden of proof. The Fifth Circuit has acknowledged that in some circumstances, proof of sentencing facts by clear and convincing evidence may

---

[3] Shafer also argues that the district court's finding that he defrauded ten or more victims is erroneous. *See* U.S.S.G. § 2B1.1(b)(2)(A)(i). He admits that this assertion of error is only applicable if we find that district court erred in calculating the loss amount. We find no error in the loss calculation, and thus no error in the calculation of the number of victims.

No. 12-10574

be required. *See United States v. Mergerson*, 4 F.3d 337, 343-44 (5th Cir. 1993). Though we have continued to leave this door open, we have never actually required a heightened burden for factual determinations at sentencing. *See United States v. Brooks*, 681 F.3d 678, 712-13 (5th Cir. 2012). Recently, we held that an enhancement that increased the sentencing range from 18-14 months to 168-210 months did not require proof by clear and convincing evidence. *Id.* at 713. Thus, the loss enhancement, which increased Shafer's sentencing range from 8-14 months to 97-121 months, likewise did not require a heightened evidentiary burden.

   c.   Criminal History Points

Shafer's last argument is that the district court erred by applying two criminal history points because Shafer was on probation at the time of the offense. U.S.S.G. § 4A1.1(d). Shafer was found guilty by a jury on June 30, 2006 of misdemeanor assault. He received a two-year probated jail sentence that was stayed pending appeal. His conviction was affirmed on appeal, and he started serving the probated sentence on October 30, 2008. During sentencing, the district court added two points to his criminal history score because he committed the instant offense from October 2008 to his arrest in 2009, while serving probation for the assault conviction. *See* U.S.S.G. § 4A1.1(d). Shafer argues that § 4A1.2(l) provides that a sentence that is stayed pending appeal shall be counted in the criminal history as if it had not been stayed, which means that for purposes of the Guidelines calculation, his probationary period started to run on June 30, 2006, as if it had not been stayed, and expired by the time he committed the instant offense.

Shafer's interpretation of the Guidelines is directly contradicted by the text of § 4A1.1(d). § 4A1.1(d) provides that two points are added "if the defendant committed the instant offense while under any criminal justice sentence, including probation. . . . " Shafer did not begin serving his probation

25

until October 2008, and was thus actually serving a sentence of probation at the time he committed the instant offense.  This situation falls squarely within the text of § 4A1.1(d).  We find no error.

I.    *Forfeiture (Shafer)*

Shafer last argues that the amount of forfeiture must be submitted to a jury.  The Supreme Court has held that there is no constitutional right to a jury trial on forfeiture. *Libretti v. United States*, 516 U.S. 29, 49 (1995).  Since *Libretti*, *Apprendi* held that any fact that increases the statutory maximum for an offense must be found by a jury. *See Apprendi v. New Jersey*, 530 U.S. 466 (2000).  In 2012, the Supreme Court held that *Apprendi* applies to criminal fines, such that any fact that increases a defendant's maximum fine must be found by a jury. *S. Union Co. v. United States*, 132 S. Ct. 2344, 2350 (2012).  Shafer argues that, like fines in *Southern Union Co*, any fact that increases the amount of forfeiture must be found by a jury.

The only circuit to have addressed this argument after *Southern Union Co.* rejected it. *See United States v. Phillips*, 704 F.3d 754, 769-770 (9th Cir. 2012), *cert. denied*, 133 S. Ct. 2796 (2013).  As the Ninth Circuit explained:

> Although criminal forfeiture undoubtedly constitutes an element of punishment, *see Libretti*, 516 U.S. at 39, there is no statutory (or guideline) maximum limit on forfeitures. Rather, criminal forfeitures are indeterminate and open-ended, and may include all property "constituting, or derived from, any proceeds the person obtained, directly or indirectly," from his unlawful conduct. 21 U.S.C. § 853(a). The Second, Fourth, and Seventh Circuits have all explicitly distinguished *Booker* and denied the right to a jury determination in the forfeiture context because forfeiture is not a "determinate sentencing scheme" with a "statutory maximum."

*Id.* at 770.  We agree with this reasoning.  The amount of forfeiture is statutorily defined as any property traceable to gross proceeds of the wire or mail fraud offenses. *See* 18 U.S.C. § 981(a)(D).  By statute, the court "shall order" the forfeiture of the property as part of the sentence if the defendant is

found guilty of the offense. 28 U.S.C. § 2461(c). Judicial fact-finding during sentencing does not increase any statutory maximum. *See Phillips*, 704 F.3d at 770-71; *see also United States v. Gasanova*, 332 F.3d 297, 301 & n.14 (5th Cir. 2003) (holding that *Apprendi* did not alter the preponderance of the evidence standard for forfeiture). We thus reject Shafer's argument that the amount of forfeiture must be submitted to the jury.

## III.  Conclusion

We AFFIRM Simpson's convictions for conspiracy, aiding and abetting the transmission of spam, and obstruction of justice. We REVERSE Simpson's conviction for false registration of a domain name and accordingly VACATE and REMAND Simpson's sentence. [4]   We AFFIRM Shafer's conviction and sentence for conspiracy.

---

[4] Simpson's outstanding motion for leave to file supplemental brief on the sufficiency of the evidence issues after *United States v. Vargas-Ocampo*, No. 11-41363, is decided en banc is DENIED. We determine that additional briefing is not necessary.