# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 18-40521

United States Court of Appeals
Fifth Circuit

**FILED**
June 26, 2019

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff - Appellee

v.

ROSIE DIGGLES; WALTER DIGGLES; ANITA DIGGLES,

Defendants - Appellants

Appeals from the United States District Court
for the Eastern District of Texas

Before HIGGINBOTHAM, JONES, and COSTA, Circuit Judges.

GREGG COSTA, Circuit Judge:

Multiple hurricanes—especially Rita and Ike—ravaged the eastern Texas Gulf Coast in the first decade of this century. Untold millions in federal disaster assistance helped rebuild those communities. But some people took advantage of that taxpayer generosity. A jury found that was the case for the three family members charged with fraud in this case: Walter and Rosie Diggles and their daughter Anita.

All three now argue that there was insufficient evidence to convict them. They also contend that, if their convictions were valid, four conditions of their supervised release must be vacated because the district court did not read

No. 18-40521

them aloud at sentencing.  We affirm their convictions and two of the disputed conditions, remanding to adjust one condition and remove another.

I.

The Deep East Texas Council of Governments (DETCOG) is an association of local governments in a twelve-county area near the Louisiana border.[1]  Using federal and state grants, DETCOG funds programs geared toward housing, the elderly, and the disabled, among other efforts.  It also administers federal hurricane-relief funds.

Congress responded to Hurricanes Katrina and Rita, and later Dolly and Ike, by appropriating block grants for relief efforts.  The Texas Health and Human Services Commission administered the funds the state received.  DETCOG in turn received millions of those dollars, which it used to reimburse various service providers in east Texas.

One of those providers was the Deep East Texas Foundation.  The Foundation operated in Jasper out of the New Lighthouse Church of God in Christ.  It sought and received reimbursements from DETCOG for a variety of services, including "case management" (counseling and assisting individuals in need of individual financial support); the 21st Century Learning Center (an after-school and summer program for at-risk children); and annual conferences hosted by the New Lighthouse Church.  A "vendor agreement" between DETCOG and the Foundation set reimbursement rates for several services, including case management and education.

A chart may be helpful.  The green arrows represent the flow of federal funds.  The blue arrows represent the chain of reimbursement requests.

---

[1] We recite the facts in the light most favorable to the government given the guilty verdicts.

2

No. 18-40521



Walter Diggles wore many hats in this reimbursement chain. He (1) ran DETCOG as its executive director; (2) was the founder of the Foundation and had signature authority over its bank account; and (3) was the pastor at the New Lighthouse Church, out of which the Foundation operated its programs. Also, one of those programs—the Learning Center—was run by his wife Anita and daughter Rosie.

Walter's multiple roles enabled the fraud. Once the hurricane funds left the state agency, Walter could control them the rest of the way. And all it took for the state to send money was for Walter to certify that DETCOG was using the money properly. For each request for Katrina and Rita funds, Walter would certify that "all outlays" were "for the purposes set forth" in the grant agreement. For the Dolly and Ike grants, he would certify that DETCOG had

"completely verified the supporting information/evidence" from its vendors so as to "justify the amounts set forth" in the requests for further funding.

But the programs' expenses did not support many of the amounts DETCOG sought. Here are some examples:

*The Learning Center:* The Foundation's vendor agreement called for reimbursement for "Education & Training" at between $48 and $144 per "unit" (the Learning Center treated an hour of instruction as a unit). But the Learning Center's teachers were paid less than $20 per hour. Anita nevertheless prepared paperwork requesting reimbursement at rates as high as $110 per hour. The Foundation sent that paperwork to DETCOG, where Walter would sign off. The rate inflation added up: Between 2009 and 2011, the Foundation got roughly $240,000 for education expenses, while paying its teachers less than $130,000.

The Learning Center's transportation costs tell a similar story. The vendor agreement did not set a unit rate for transportation, but the Learning Center charged one: at least $10, and sometimes as high as $17, per student for round-trip transportation to and from the Learning Center in vans. The designated pick-up areas were mostly in Jasper, and the few in surrounding communities were no more than 5–10 miles away. But the reimbursement rates meant the Foundation received, in one of the most extreme instances, nearly $7,500 for four days of transportation costs. Between 2008 and 2011, the Foundation billed north of $200,000 for transportation despite paying less than $30,000 in transportation-related expenses. The government acknowledges that those numbers do not include amounts paid to drivers, but Learning Center workers who drove the vans were paid around $8 an hour—nowhere near enough to account for the $170,000 discrepancy.

*Case Management:* The vendor agreement set rates for case management at, as with education, between $48 and $144 per hour. But one case manager

No. 18-40521

testified he was paid just $10 an hour, and another testified she was paid $27. Between 2009 and 2011, the Foundation received $150,000 for case management expenses but paid case managers just $82,000.

*2009 "Closeout":* In 2009, the Foundation sought and received a "closeout" payment of $245,000 for unreimbursed expenses. That included a $116,000 request for the Foundation's 2008 payroll expenses. But this was double billing—the Foundation had already billed for payments to its workers throughout 2008.

*2010 Conference:* Walter's church held annual conferences, which one witness described as akin to revivals. In addition to worship, the conferences featured workshops on topics like single parenting and credit repair. For its 2009 conference, the Foundation sought and received reimbursement for 186 "units" of training (each workshop attended was a unit, and some attendees went to more than one workshop) at $48 each—a total reimbursement just shy of $9,000. By way of supporting documentation, the Foundation submitted the attendees' sign-in sheets, which reflected the workshops they went to.

For the 2010 conference, the Foundation got more than four times as much: $39,000. But the supporting documentation was a fabrication; it was a copy of the 2009 sign-in sheets with just a few additions. The purported attendees were the same, and the tops of both sets read "Annual Conference July 7-11, 2009." The difference was that some of the "2010" sign-in sheets had blank spots filled in to make it look like attendees went to additional workshops as well as those they attended in 2009.

*2012 Conference:* At its 2012 conference, the church performed health screenings. The screening equipment (cholesterol machines and glucometers that could be used any number of times, plus one-time-use blood sugar test strips) cost about $750. But the Foundation sought and received reimbursement at $144 for each of 61 people screened, or $8,784 total.

No. 18-40521

Where did the extra money go?  Walter, Anita, and Rosie used it for personal expenses.  Over 99% of the money in the Foundation's accounts was from hurricane relief.  The Foundation transferred hundreds of thousands of those dollars into the New Lighthouse Church's accounts.  And money in the church accounts went to pay the defendants' credit card bills, to write checks to cash or to family members, and to pay for other personal expenses.

The grand jury charged Walter with conspiracy to commit wire fraud, eleven counts of wire fraud, two counts of theft from a program receiving federal funds, and three counts of money laundering.  It charged Rosie with the conspiracy count, ten counts of wire fraud, and a money laundering count.  Anita was charged with only the conspiracy count.  The jury convicted on all counts.  The district court sentenced Walter to 108 months.  Rosie and Anita received below-Guidelines sentences of 54 months.  The district court also imposed terms of supervised release for each defendant and ordered Walter to pay $1.33 million in restitution, with Rosie and Anita jointly and severally liable for just over $970,000.

## II.

Each defendant argues that the government's evidence was insufficient to find them guilty.  We review the evidence "in the light most favorable" to the verdict.  *United States v. Miles*, 360 F.3d 472, 476–77 (5th Cir. 2004).  We must affirm the verdict unless no rational jury could have found the defendants guilty beyond a reasonable doubt.  *United States v. Njoku*, 737 F.3d 55, 62 (5th Cir. 2013).

## A.

Walter challenges the sufficiency of the evidence for each count.  We begin with his arguments that go to all counts and then consider his challenges to individual ones.

6

No. 18-40521

Walter does not dispute that the Foundation asked for and received more than its expenses, but contends that doing so was allowed for two reasons. First, he argues that the Foundation charged rates set by its vendor agreement with DETCOG. But the jury had good reason to see the vendor agreement as part of the fraud, not a defense to it (to say nothing of the fact that it set rates for teachers and case managers but not, for instance, for transportation or health screenings). Walter's idea appears to be that negotiated rates cannot be fraudulently inflated. But he was essentially on both sides of the agreement—this was not an arm's length negotiation. Walter signed the vendor agreement for DETCOG in his capacity as executive director; he had the last word on the rates and on one occasion rejected an attempt by DETCOG employees to lower them. On the other side of the vendor agreement, while Walter did not sign on the Foundation's behalf (its president, R.C. Horn, did), Walter was the founder of the Foundation, had signature authority over its bank accounts, and pastored the church out of which it operated. There is also evidence that he held substantial sway over Horn. Walter thus controlled the agreed rates. That made the scheme a more sophisticated one, not a lawful one.

Walter's other argument for why the Foundation was allowed to bill above costs is based on federal guidance on how nonprofits should treat overhead costs. The contract between the Commission and DETCOG cites an OMB circular on accounting principles for nonprofits, which says that overhead costs may be allocated to reimbursements for services rendered under a grant. *See* OFFICE OF MGMT. & BUDGET, CIRCULAR NO. A-122, *Cost Principles for Non-Profit Organizations*, at 7 (2004) (allowing allocation of costs that are "necessary to the overall operation of the institution, although a direct relationship to any particular cost objective cannot be shown."). But even if some of the Foundation's rate inflation was to cover overhead costs allocated

to the hurricane-relief grants, there is no reason to think that accounted for reimbursements so far above what the Foundation paid for those services. Plus, no one contemporaneously believed DETCOG was reimbursing the Foundation in part for overhead. One of DETCOG's managers for block-grant funds testified that DETCOG employees understood that reimbursements could not exceed a vendor's actual costs for services. Similarly, a memo from DETCOG's controller instructed that the Foundation's "hourly rate for education services and case management should not exceed actual costs." The Foundation's reimbursement requests, too, purported to bill for the "cost" of particular "allowable services," without any indication that overhead was included. The jury reasonably rejected Walter's overhead-cost defense.

Before getting into Walter's count-specific arguments, we address one more generally applicable issue: intent to defraud. Insufficient evidence of that intent would undermine most of Walter's convictions.[2] But there is plenty. Walter was the pastor of the church out of which the Foundation operated and sometimes paid the Foundation's employees. So there is good reason to conclude that Walter knew both what employees were being paid and at least the approximate costs of other services the Foundation provided. He nevertheless certified to the Commission that the Foundation's paperwork (which included inflated rates) justified the reimbursements. In one instance particularly revealing of Walter's intent, DETCOG employees grew concerned during 2009 about the Foundation's reimbursement rates. They decided to reduce them, but Walter instructed that they be put "back the way they were."

---

[2] *See United States v. Simpson*, 741 F.3d 539, 547 (5th Cir. 2014) (fraud conspiracy under 18 U.S.C. § 1349 requires proof of intent to defraud); *United States v. Hoffman*, 901 F.3d 523, 545 (5th Cir. 2018) (same for substantive wire fraud). Walter's money laundering convictions required that the funds he transacted came from a "specified unlawful activity." 18 U.S.C. § 1957. The grand jury alleged the fraud conspiracy as that activity, so those convictions also require intent to defraud.

It is hardly surprising that Walter wanted to keep the overbilling gap; he was its main beneficiary. Roughly $400,000 went from the Foundation to the church accounts, out of which Walter paid over $150,000 in credit card bills, paid off a $40,000 loan to an entity run by Walter and his son, and made numerous checks out to family members and to cash. The evidence paints a compelling picture of Walter's intent to defraud.

Moving on to his to count-specific arguments, Walter argues that the email that is the interstate wire for his first wire fraud count—one he sent conditionally approving reimbursement for the church's 2010 annual conference—did not involve a misrepresentation. This misunderstands the wire requirement. The wire "need not contain a falsehood"; it need only further the fraud scheme (which itself must involve lies). *United States v. Hoffman,* 901 F.3d 523, 545–46 (5th Cir. 2018). The Count 2 email advanced the fraud as it put the Foundation one step closer to obtaining government funds for the 2010 conference. *See id.* at 547 (holding that an email that was "a step in verifying" costs submitted to the government furthered a fraud scheme). And we have already explained that the overall fraud scheme contained numerous misrepresentations related to costs, including the ultimate submission of fabricated paperwork to support requests related to the 2010 conference.

Walter's other ten wire fraud convictions involve interstate transfers from the church's main bank account to his credit cards. These likewise furthered the fraud. Indeed, to the fraudster, obtaining the proceeds is not just part of the fraud, it is the reason for it. *See United States v. Vilar*, 729 F.3d 62, 95 (2d Cir. 2013) ("In as much as [the defendant] used the wire transfers to send the money to his own account, the wire transfers were undoubtedly in furtherance of the scheme to defraud."). There is sufficient evidence for all the wire fraud convictions.

No. 18-40521

Next, Walter disputes his two convictions for theft from a program receiving federal funds. That crime occurs when an agent of a federally funded entity steals or "knowingly converts" at least $5,000 of the organization's property. 18 U.S.C. § 666(a)(1)(A). The first of these counts was based on the 2010 conference (the one with the fabricated sign-in sheets), and the second was based on the 2012 conference (the one with the health screenings). As to the 2010 conference, we reject Walter's argument that he was unaware of the phony documentation. Along with the evidence generally showing that Walter orchestrated the overbilling scheme, Walter approved reimbursements for both the 2009 and 2010 conferences despite the nearly identical supporting paperwork. When the $39,000 in federal funds arrived at the Foundation, Walter promptly wrote a $39,000 check to the church days later.

For the 2012 conference, Walter instructed the Foundation's president (Horn) to cut a $7,500 check to a health service run by Walter's sister as part of the reimbursement. Horn did as he was told, but Walter deposited the check into the main church account, which he essentially used as a personal account. That conversion, combined with the evidence that the Foundation received over $8,000 in reimbursement for health screenings that cost it less than $1,000, supports the conviction.

We last address Walter's money laundering convictions. A section 1957 crime occurs when a defendant engages in a financial transaction with property worth over $10,000, knowing that the property was derived from unlawful activity. *United States v. Alaniz*, 726 F.3d 586, 602 (5th Cir. 2013). The statute does not require concealment of funds, *id.*, so Walter's objection on that ground fails. But his argument that the charged funds did not come from unlawful activity (or at least that he did not know that) do target an element of the offense. We consider those objections to each count.

10

No. 18-40521

The first money laundering count involves deposits Walter made following the 2010 conference. We have already addressed Walter's knowledge of the fabrication underlying that reimbursement. When, armed with that knowledge, Walter deposited the $39,000 check from the Foundation he violated section 1957.

The next two counts relate to the 2009 "closeout" reimbursement, the one that double billed for the Foundation's 2008 payroll. Walter used some of these federal funds to purchase CDs, which he later cashed and deposited back into the church account. For the reasons we have already recited demonstrating Walter's involvement in, indeed leadership of, the fraud, the jury could find that he was not oblivious to the unlawful source of these funds. Walter's transactions with the closeout funds support his section 1957 convictions.[3]

We uphold each of Walter's convictions.

### B.

We now move to Anita, who was charged and convicted only of conspiracy. We have already explained that the evidence supports the jury's finding that Walter orchestrated a scheme to defraud. The sufficiency question for Anita is whether she agreed to participate in it, with the intent that it succeed. *See United States v. Simpson*, 741 F.3d 539, 547 (5th Cir. 2014).

Direct evidence of an agreement to commit a crime is rare, so circumstantial evidence often proves a conspiracy. There is enough of that type

---

[3] Walter's deposits into the church's bank account were "monetary transactions" under section 1957. *See* 18 U.S.C. § 1957(f)(1). And although Walter does not raise the issue of distinguishing the proceeds of the fraud from the subsequent deposits of those proceeds, we note that the fraud was complete once the overbilled funds hit the Foundation's account, over which Walter had signature authority. *See United States v. Leahy*, 82 F.3d 624, 635 (5th Cir. 1996) ("Fraudulent schemes produce proceeds, 'at the latest when the scheme succeeds in disgorging the funds from the victim and placing them into the *control* of the perpetrators.'" (quoting and emphasizing *United States v. Allen*, 76 F.3d 1348, 1361 (5th Cir. 1996)). The fraud got the money into the Foundation's account; the money laundering got it into the church's.

of evidence here—in the form of concerted action, knowledge of the fraud, and profiting from it—to support the conviction. Anita and Walter worked together to make the overbilling happen: Anita administered the Learning Center, submitting the inflated reimbursement requests, which Walter signed off on. *See United States v. Curtis*, 635 F.3d 704, 719 (5th Cir. 2011) (noting that "concerted action" is evidence of agreement). Anita knew about the overbilling. As the person overseeing the Learning Center, Anita could see both sides of the ledger. She authorized pay for teachers, signed checks for fuel, and knew what the drivers were paid. But she requested reimbursement at higher "cost per unit" rates. Last but not least, she benefitted from the fraud, using the proceeds to pay for her car and rent among other things. *See id.* at 719 (recognizing that receiving a substantial share of a fraud conspiracy's proceeds is evidence of involvement). The jury reasonably found Anita guilty of conspiracy.

## C.

Rosie challenges her convictions for conspiracy and wire fraud. Her case is closer than Anita's. Both were supervisors at the Learning Center, and there is evidence that Rosie too knew what its actual costs were. Yet unlike with Anita, there is no evidence that Rosie handled reimbursement requests. That is, while Anita knew and facilitated both sides of the ledger, Rosie appears only to have participated in the Learning Center's operations, not its funding.

But as long as the evidence supports a reasonable inference that Rosie knew of the overbilling scheme, her "minor participation" in it can support her convictions. *United States v. Stephens*, 571 F.3d 401, 404 (5th Cir. 2009). Rosie was at the Learning Center daily and told employees what to do. She made hiring decisions and ran staff meetings. Rosie was thus integrally involved in the functioning of the Learning Center, without which a substantial portion of the overbilling scheme would not have been possible. If Rosie knew that Anita

was submitting inflated reimbursement requests for Walter to sign off on, the jury could conclude from her supervision of the Learning Center that she had agreed to help facilitate the fraud.

Although the proof of Rosie's knowledge is weaker than it is for the other defendants, it is enough for us to uphold the verdict of the jury that sat through this nine-day trial. Rosie was married to one conspirator, and her daughter was another. Those family ties are insufficient on their own to prove she joined the conspiracy, but they are one factor that can be considered along with other indications that she knew about the fraud. *United States v. Willett*, 751 F.3d 335, 340 (5th Cir. 2014). Foremost among that additional evidence, Rosie knew that hurricane money was travelling from DETCOG into the church accounts, which she then used for personal expenses. Rosie admitted that she knew Walter ran DETCOG and that the Foundation got grant funds from DETCOG. She also knew that money in the church accounts came from the Foundation; on one occasion, she deposited a $30,000 check from the Foundation into the church's youth department account. She had signature authority on that account, almost all the money in which came from the Foundation, as well as the church's main account. The jury could infer from her access to those accounts that she knew the church received hundreds of thousands of dollars from the Foundation.

She also benefitted from the fraud. In addition to what she derived from Walter's use of proceeds to pay credit card bills, Rosie made around $13,000 in cell phone payments (among others) from the youth department account. She also made $15,500 in credit card payments from the account for her ministry, "Heart to Heart," where nearly all the money came from the youth department

No. 18-40521

account.[4] In the absence of overbilling, there would have been no money left over for personal expenses like these. Rosie's awareness and use of the extra cash coming from the Foundation supports the inference that she knew the Foundation was overbilling.

Statements Rosie made to the FBI could also be one of the puzzle pieces that the jury concluded fit together to show guilt. When asked about Walter's role at the Foundation, Rosie said that Walter had nothing to do with it beyond providing advice when requested, and specifically that Walter did not help the Foundation get any grant money. She also said that the money in the Heart to Heart account came from donations—that is, not the Foundation. The jury could have taken those false statements to indicate that Rosie knew she ought to hide her awareness of the scheme. *See United States v. Villarreal*, 324 F.3d 319, 325 (5th Cir. 2003).

We uphold each of Rosie's convictions.

### III.

Only Rosie appeals the prison time she received. She argues that the district court misapplied a two-level enhancement added when "the offense involved . . . a misrepresentation that the defendant was acting on behalf of a charitable, educational, religious, or political organization, or a government agency." U.S.S.G. § 2B1.1(b)(9)(A). The enhancement clearly applies if a defendant lied about having any connection to a listed organization. Less obviously, it also applies if a defendant had authority to act for a charity but diverted some of the funds the nonprofit received for "personal gain." *Id.* cmt.

---

[4] These credit card and phone payments were the bases for Rosie's ten individual wire fraud convictions. As we find enough evidence that she joined the scheme to defraud, these payments were one way she received the benefit of that fraud. They thus furthered the scheme and support her wire fraud convictions. *See Vilar*, 729 F.3d at 95.

14

No. 18-40521

n.8(B); *see United States v. Reasor*, 541 F.3d 366, 372 (5th Cir. 2008).  That is the basis for the enhancement here.

Rosie argues that although Walter solicited funds for DETCOG, and Anita solicited funds for the Learning Center, she never solicited funds so could not have made a covered misrepresentation.  This ignores that the Guidelines hold Rosie responsible for the foreseeable acts of her coconspirators.  U.S.S.G. § 1B1.3(a)(1)(B).  The requests for government funds were foreseeable, indeed integral, parts of the conspiracy.  As we have upheld Rosie's conviction as a coconspirator, Walter's and Anita's solicitations are attributable to her.  There was no Guidelines error.

IV.

Each defendant challenges the four special conditions of supervised release listed in their judgments.  These conditions require each defendant to: (1) "pay any financial penalty that is imposed by the judgment"; (2) "provide the probation officer with access to any requested financial information for purposes of monitoring restitution payments and employment"; (3) "not incur new credit charges or open additional lines of credit without the approval of the probation officer" until full payment is made; and (4) "not participate in any form of gambling" until full payment is made.  The defendants' objection is that the district court did not officially recite these conditions at sentencing.  Instead, the judge told them that the conditions recommended in their Presentence Reports, which included the four special conditions, would be conditions of their supervised release.  He even identified the page numbers of the PSRs listing the conditions.  The government nonetheless concedes that by failing to "orally recite the special conditions one by one," the district court erred, warranting removal of the four special conditions from the defendants' judgments.

15

No. 18-40521

The requirement that a judge orally state a sentence is a product of the defendant's constitutional right to be present at sentencing. *United States v. Martinez*, 250 F.3d 941, 942 (5th Cir. 2001).  To preserve that right, the oral pronouncement controls over a conflicting written judgment. *United States v. Mudd*, 685 F.3d 473, 480 (5th Cir. 2012).  A true conflict is not required; including an unpronounced aspect of the sentence in the written judgment may "broaden" the oral sentence and thus "conflict" with it. *United States v. Rivas-Estrada*, 906 F.3d 346, 350 (5th Cir. 2018).  We have been strict about this requirement, recently holding that a district court abused its discretion in telling the defendant only that the conditions listed in the PSR would be imposed. *Id.* at 350–51.

*Rivas-Estrada* is difficult to reconcile with older caselaw holding that written notice of the conditions at sentencing suffices. *See United States v. Rouland*, 726 F.3d 728, 734 (5th Cir. 2013) (upholding practice in which the government moves at sentencing to admit an exhibit listing special conditions, even though the court does not individually recite them); *see also United States v. Al Haj*, 731 F. App'x 377, 379 (5th Cir. 2018) (finding no error when defendant signed a paper listing the conditions).  The need for notice underlies the oral pronouncement requirement. *Rouland*, 726 F.3d at 733–34 (5th Cir. 2013).[5]  When a sentencing judge makes no mention, either directly or indirectly, of a condition, the lack of notice deprives the defendant of an

---

[5] More precisely, whether the defendant had notice of a special condition determines the standard of review.  Without adequate notice, discrepancies between the written judgment and the oral pronouncement are reviewed for abuse of discretion; with it, they are reviewed for plain error. *Rivas-Estrada*, 906 F.3d at 348–49; *Rouland*, 726 F.3d at 733–34.  But this determination is the "critical" one. *Rivas-Estrada*, 906 F.3d at 348; *see Rouland*, 726 F.3d at 734 (accepting defendant's concession that an unpronounced special condition did not affect his substantial rights, as necessary for reversal under plain error review).

opportunity to object.  But the defendant has that opportunity when the court referred to a list of the conditions being imposed.  *Id.* at 734.

The only difference between this case and *Rouland* is that the referenced lists of the Diggles' conditions were their Presentence Reports rather than a separate document.  It is hard to see why that makes a difference.  *But see Rivas-Estrada*, 906 F.3d at 349–50 (framing the district court in *Rouland* as having done "more than the minimum" by offering a "unique chance to object").  One of the first questions a court typically asks at sentencing is whether the defendant has reviewed the PSR.  The court followed that standard script in this case.  As the key sentencing document, the PSR is also available at the hearing.  The defendant thus has written notice of the conditions and an opportunity to object both when a court refers to a list in the PSR (especially when it does so by page number as happened here) and when it refers to *Rouland*'s separate exhibit listing the conditions.

But we are bound to follow *Rivas-Estrada*'s view that referring to the PSR is not enough, which is why the government concedes.  We are not, however, required to follow the government's overall concession on this issue.  *United States v. Hope*, 545 F.3d 293, 295 (5th Cir. 2008).  Our "independent review," *id.*, reveals no conflict between the oral sentence and the written one for three of the disputed special conditions.  One of them is so obviously in tune with the oral sentence that it cannot be said to have created a conflict.  Two others, despite being described as special conditions, are actually standard conditions (though one needs a slight adjustment).  And an unannounced standard condition does not create a conflict.  *Rivas-Estrada*, 906 F.3d at 348.

At this point, some background on the types of supervised release conditions is useful.  Mandatory conditions are required by statute.  U.S.S.G. § 5D1.3(a).  Standard conditions are "recommended" in all circumstances.  *Id.* § 5D1.3(c).  As both are "implicit in the very nature of supervised release," they

17

are presumed to be part of the judgment and need not be orally pronounced. *United States v. Torres-Aguilar*, 352 F.3d 934, 936 (5th Cir. 2003) (quoting *United States v. Truscello*, 168 F.3d 61, 62 (2d Cir. 1999)).  In contrast, special conditions are ones that "may be appropriate" on a case-by-case basis, U.S.S.G. § 5D1.3(d), and that ad hoc applicability warrants putting defendants on notice at sentencing by reading special conditions aloud.

The key is that sometimes a condition labeled special is really a standard condition.  *See Rouland*, 726 F.3d at 735 ("[S]pecial conditions may be tantamount to standard conditions under the appropriate circumstances, thereby precluding the need for an oral pronouncement.").  Aside from being potentially "appropriate" in any case, the special conditions in section 5D1.3(d) are "recommended" in certain circumstances.  And when a condition is recommended, it is essentially a standard condition and thus need not be orally pronounced.  *Torres-Aguilar*, 352 F.3d at 937–38.  That the Guidelines would still call that condition special is "irrelevant."  *Id.* at 937 (quoting *United States v. Asuncion-Pimental*, 290 F.3d 91, 94 (2d Cir. 2002)).

Under this principle, the access-to-financial-information condition is a standard condition.  It is recommended by section 5D1.3(d) when restitution is ordered, which it was for each defendant.  U.S.S.G. § 5D1.3(d)(3).  As a result, the district court did not err in failing to recite this standard condition at sentencing.

The Guidelines also recommend a no-new-credit condition when restitution is ordered.  U.S.S.G. § 5D1.3(d)(2).  So a prohibition on new credit was implicit in the defendants' oral sentences.  But the Guidelines version prohibits new credit "unless the defendant is in compliance with the payment schedule."  *Id.*  The defendants' written judgments set up a monthly payment schedule but, in contrast to the Guidelines, prohibit new credit "unless payment . . . has been made in full."  The written judgments thus broaden the

extent of the prohibition; under the Guidelines version, the defendants could open new lines of credit so long as they keep up with their payments, but under the written judgment, they can open new lines of credit only once they pay the full amount of restitution.  We remand for the district court to reform the written no-new-credit condition to match the one implied by the oral sentence of restitution—that is, the Guidelines version.  *See United States v. Mireles*, 471 F.3d 551, 558 (5th Cir. 2006) ("If a conflict exists, the appropriate remedy is remand to the district court to amend the written judgment to conform to the oral sentence.").

As for the condition requiring payment of financial penalties, we do not see how it could conflict with an oral sentence imposing those penalties.  *See United States v. Warden*, 291 F.3d 363, 365 (5th Cir. 2002) (explaining that a written condition does not conflict with an unpronounced condition if the condition "is clearly consistent with the district court's intent . . . as evidenced in the statements made by the court at the sentencing hearing").  Requiring a defendant to make those payments is consistent with, if not essential to, those penalties.  Indeed, a "special" condition requiring payment of restitution is largely unnecessary.  Making restitution payments is a mandatory condition of supervised release, as the defendants' written judgments also reflect.  U.S.S.G. § 5D1.3(a)(6).  This may show that the "special" condition was for the most part redundant (it just adds payment of the special assessment, an amount that pales in comparison to restitution), but it also shows that it does not conflict with the rest of the sentence.

We do, however, vacate the no-gambling condition.  The Guidelines do not include it as a condition recommended if restitution is ordered.  And forbidding gambling is not so "clearly consistent" with an oral pronouncement of restitution as to be reasonably encompassed within that pronouncement.  *Contrast Warden*, 291 F.3d at 365 (holding that a written condition requiring

No. 18-40521

defendant to pay for drug treatment was clearly consistent with a pronounced condition requiring the defendant to get drug treatment).

\*    \*    \*

We AFFIRM the judgments of conviction, VACATE the "no-new-credit" and "no-gambling" conditions for the supervised release terms, and REMAND for the district court to amend its written judgments by (1) reforming the no-new-credit condition to conform to section 5D1.3(d)(2) of the Guidelines, and (2) removing the no-gambling condition.